**U.S. BANKRUPTCY COURT**
**District of South Carolina**

Case Number:  **11-04387-jw**

## ORDER

The relief set forth on the following pages, for a total of 21 pages including this page, is
hereby ORDERED.



**FILED BY THE COURT**
**04/02/2012**

_John E. Waites_
Chief US Bankruptcy Judge
District of South Carolina

Entered: 04/02/2012

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | C/A No. 11-04387-JW |
| | Chapter 11 |
| Pamplico Highway Development, LLC, | **ORDER** |
| Debtor(s). | |

   This matter comes before the Court for confirmation of the Second Modified Plan of Reorganization filed by Pamplico Highway Development, LLC ("Debtor"). First Citizens Bank & Trust Company, Inc. ("First Citizens") filed an objection to confirmation. The Internal Revenue Service of the United States of America ("IRS") also filed an objection to confirmation, which was withdrawn at the confirmation hearing. This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157. Pursuant to Federal Rule of Civil Procedure 52, which is made applicable to this matter by Federal Rules of Bankruptcy Procedure 7052 and 9014(c), the Court makes the following Findings of Fact and Conclusions of Law.

### <u>FINDINGS OF FACT</u>

   1. Debtor commenced this bankruptcy case by filing a petition for relief under Chapter 11 of the Bankruptcy Code on July 12, 2011. Debtor owns commercial real property at 1520 American Drive, Florence, South Carolina ("American Drive Property") and at 850 Woody Jones Boulevard, Florence, South Carolina ("Woody Jones Property"), which it leases to third parties. Debtor also operates restaurants known as "Jack's Place" at the American Drive Property and at another location in Pamplico, South Carolina, which is leased by Debtor.

2.      First Citizens is the holder of a note ("Note A") secured by a mortgage and assignment of rents on the American Drive Property, and a note ("Note B") secured by a mortgage and assignment of rents on the Woody Jones Property.

3.      Prior to filing its petition for bankruptcy relief, Debtor defaulted on its obligations under Note A and Note B, and First Citizens declared the entire balance of its notes due and payable in full.

4.      First Citizens filed a Motion for Relief from Stay or for Adequate Protection on July 28, 2011.  Following a hearing, the Court denied the motion upon certain conditions set forth in an order entered on October 21, 2011, which also scheduled a continued hearing for further consideration of the motion. The parties subsequently settled the matter and the Court entered a Consent Order Regarding Adequate Protection Payments to First Citizens and Use of Cash Collateral on December 29, 2011.

5.      On September 14, 2011, First Citizens filed proofs of claim asserting secured claims in the amount of $1,202,119.44 for Note A and $1,633,399.49 for Note B.

6.      Debtor filed its original Disclosure Statement and Plan of Reorganization on September 30, 2011.

7.      On November 2, 2011, First Citizens filed its election to have its claim treated and allowed as fully secured pursuant to 11 U.S.C. § 1111(b).

8.      In order to address First Citizen's election under 11 U.S.C. § 1111(b), Debtor filed an amended plan and disclosure statement on November 23, 2011.

9.      First Citizens and the IRS both filed objections to confirmation on January 9, 2012.

10.    On February 24, 2012, Debtor filed its Second Modified Plan of Reorganization ("the Plan") in order to address issues raised in by First Citizens and the IRS in their objections.

11.    As to Note A, the Plan provides that First Citizens shall retain its lien to the extent of its allowed claim, $1,191,264.96.[1]  It further provides:

> The Debtor will make deferred cash payments to First Citizens Bank. The payments will have a present value of $935,795.79 (Appraised value of $957,000.00, minus a senior lien consisting of real estate taxes in the amount of $21,204.21).
>
> The allowed secured claim of First Citizens Bank shall be satisfied in full by the debtor amortizing the amount thereof with interest as follows:  i) commencing the first day of the month following the month in which the Effective Date falls and continuing on the first day of each month thereafter, the Debtor shall pay First Citizens the amount of the Allowed Secured Claim of First Citizens Bank, with interest at the rate of five and one-half (5.5%) per annum, in consecutive monthly installments of $5,179.95 in months 1 through 60, and then $5,679.95 in months 61 - 120, calculated based upon an amortization of three hundred months from and after the effective date.  Notwithstanding such amortization period, any unpaid accrued interest and principal shall be due and payable, in full, on the 120th month following the month of which the effective date falls. First Citizens shall retain its lien on the American Drive property, to the extent of the allowed amount of such Claim; otherwise the lien shall be void and of no force and effect.  In the event of prepayment, a sale of the property, or the payoff in the 120th month, whichever occurs first, First Citizens will receive a premium payment calculated by deducting from First Citizens total claim the total of all payments (principal and interest, including adequate protection payments) to ensure full payment of creditor's total claim of $1,202,119.44. Except as modified herein, all other terms and conditions of the original loan documents remain in full force and effect.

12.    As to Note B, the Plan provides that First Citizens shall retain its lien to the extent of its allowed claim, $1,619,787.81,[2] and the payments will have a present value of $1,000,594.00.[3]  It further provides:

---

[1]    This amount is calculated by subtracting the adequate protection payments in the amount of $5,427.24 each, made in January and February 2012, from the proof of claim filed in the amount of $1,202,119.44.

The allowed secured claim of First Citizens Bank shall be satisfied in full by the debtor amortizing the amount thereof with interest as follows:  i) commencing the first day of the month following the month in which the Effective Date falls and continuing on the first day of each month thereafter, the Debtor shall pay First Citizens the amount of its Allowed Secured Claim, with interest at the rate of five and one-half (5.5%) per annum, in consecutive monthly installments of $5,580.53 in months 1 through 60,and $6,080.53 in months 61 - 120, calculated based upon an amortization of three hundred months from and after the effective date. Notwithstanding such amortization period, any unpaid accrued interest and principal shall be due and payable, in full, on the 120th month following the month of which the effective date falls.  First Citizens shall retain its lien on the Woody Jones Boulevard property, to the extent of the allowed amount of such Claim; otherwise the lien shall be void and of no force and effect.  In the event of prepayment, a sale of the property, or the payoff in the 120 month, whichever occurs first, First Citizens will receive a premium payment calculated by deducting from First Citizens total claim the total of all payments (principal and interest, including adequate protection payments) to ensure full payment of creditor's total claim of $1,633,399.49. Except as modified herein, all other terms and conditions of the original loan documents remain in full force and effect.

13.    The value of the American Drive Property, as of the date of the confirmation hearing, is $957,000.00.  The value of the Woody Jones Property, as of the date of the confirmation hearing, is $1,022,000.00. The valuation of these properties is not disputed.  The American Drive Property is subject to a tax lien in the amount of $21,204.21 and the Woody Jones Property is subject to a tax lien in the amount of $21,406.11.  The tax liens are senior in priority to the liens held by First Citizens.

14.    Debtor proposes to fund the Plan from the continued operations of Jack's Place of Florence restaurants, and from the rental income generated by its commercial real property.

---

[2]    This amount is determined by subtracting adequate protection payments in the amount of $6,805.84 each, made in January and February 2012 from the proof of claim filed in the amount of $1,633,399.49.

[3]    This amount is determined by subtracting a senior lien of real estate taxes in the amount of $21,406.11 from the appraised value of $1,022,000.00.

15.    At the confirmation hearing, Debtor presented the testimony of Catherine Holt, a certified public accountant,[4] regarding its present financial situation and budget projections.  Debtor presented into evidence business records prepared by Ms. Holt that show its post petition income from operations, rental income under current occupancy levels, rental income under full occupancy levels, and budget projections.  Ms. Holt testified that Debtor's financial situation has improved since the filing of the petition as a result of the addition of a new tenant to the Woody Jones Property, La Bamba, and the conversion of a non-performing location of Jack's Place into steady monthly rental income through a lease to 1720 Burger Bar.  These tenant additions have increased Debtor's annual income by $84,264.00 as to the Woody Jones Property.  She further testified that Debtor has been able to increase the profitability of its other Jack's Place restaurant locations by cutting costs and changing the menu, resulting in a positive cash flow to Debtor.  She also testified that the budget projections do not take into account a likely increase in income as a result of obtaining an alcohol beverage license for the Jack's Place at the American Drive Property.  She testified that the present financial situation and budget projections of Debtor, without considering this potential for increased income from alcohol sales, indicate that Debtor will have sufficient income to fund the Plan.

16.    Ms. Holt also testified regarding her calculation of the proposed interest rate for payment of the loans to First Citizens under the Plan and the present value of the proposed stream of payments.  Ms. Holt was qualified as an expert witness on this subject based on her educational background and training as a certified public accountant. She calculated the interest rate using the "formula approach" by adding a risk premium to the

---

[4]    Ms. Holt serves as Debtor's accountant and is the daughter of its members.

Wall Street Journal prime rate of 3.25%. To determine the risk premium, she considered the circumstances of the estate, including the tenant additions and increased profitability of its restaurants; the nature of the security, including the fact that the properties are in a growth neighborhood, are relatively new construction and have below average risk; and the duration and feasibility of the Plan. Her determination regarding the nature of the security was derived from an appraisal prepared by First Citizens' appraiser, Andrew Fowler. Based on her analysis, she determined that a risk premium of 2.25% was appropriate for a total interest rate of 5.50%. Ms. Holt testified that the payments of principal and interest under the Plan would provide First Citizens with a present value of $935,795.79 for Note A (Appraised value of American Drive Property at $957,000.00, minus a senior lien consisting of real estate taxes in the amount of $21,204.21), and a present value of $1,000,594.00 for Note B (Appraised value Woody Jones Property of $1,022,000.00, minus a senior lien of real estate taxes in the amount of $21,406.11).

17.     First Citizens presented the expert testimony of Andrew Fowler, a commercial real estate appraiser. He testified that he believed the proper interest rate for a loan of this nature would be "somewhere in the neighborhood of 6.25 to 6.75%." This rate was determined using a Permanent Financing table for 4th Quarter 2011, prepared by RealtyRates.com, which shows a minimum interest rate of 3.10%, a maximum interest rate of 8.59% and an average interest rate of 5.18%, for loans having a loan to value ratio of between 50 to 80%. He made an upward adjustment to the rate to account for the loans at issue having a loan to value ratio of 100%. He also calculated the present value of the stream of payments using a 10% discount rate by relying on an Investment Rates table prepared by RealtyRates.com. Using this discount rate, he testified that the present

6

value of the stream of payments would be $692,601.00 for Note A and $793,686.00 for Note B.[5]

18.     First Citizens also presented the testimony of Terry Kirven, Special Assets Officer of First Citizens.  He testified that he was familiar with commercial lending practices of First Citizens and its competitors.  He stated that a commercial loan with a loan to value ratio of 70% would have an interest rate of 6.50 to 6.75% under current market conditions.  He further testified that an additional adjustment for risk would be required since the loans at issue have a loan to value ratio of 100%, but that there is not a market for these loans on the terms proposed by Debtor.

19.     First Citizens submitted a ballot rejecting Debtor's Plan for each of its claims, which are treated in Class 2 and Class 3 of the Plan. No other creditor voted to reject the Plan. Debtor received ballots accepting the Plan from two impaired classes, including the unsecured class.

## CONCLUSIONS OF LAW

First Citizens, an impaired creditor under the Plan, argues that the Plan does not satisfy the requirements of 11 U.S.C. § 1129,[6] and cannot be confirmed because the Plan does not satisfy the "fair and equitable" requirement for cram down of First Citizen's claims pursuant to § 1129(b) since it does not recognize its rights as an electing creditor under § 1111(b) and the deferred cash payments proposed under the Plan do not provide

---

[5]        The chart, which was admitted into evidence, provides discount rates for different property types during 4th Quarter of 2011.  For both properties, he considered the discount rates provided for recapitalization (refinancing) of "Un-Anchored Retail," which had a minimum rate of 8.23%, a maximum rate of 16.09%, and an average rate of 12.76%.

[6]        Further references to the Bankruptcy Code shall be by section number only.

it with a present value equal to the present value of its interest in the collateral.[7] Debtor argues that the Plan should be confirmed over the objection of First Citizens because the Plan provides for First Citizens to retain its liens and receive deferred cash payments which total its allowed claims and have a present value that is not less than the value of the collateral.  As the proponent of the Plan, Debtor bears the burden of demonstrating by a preponderance of the evidence that the Plan satisfies the conditions of § 1129.  In re Dunes Hotel Assocs., 188 B.R. 174, 183 (Bankr. D.S.C. 1995).

### *Fair and Equitable Requirement*

Section 1129(b) provides that if all applicable requirements of § 1129(a) are met, except for § 1129(a)(8), a plan may only be confirmed if (1) it does not discriminate unfairly[8] and (2) it is fair and equitable with respect to each class of claims and interests that is impaired and has not accepted the plan. § 1129(b)(1); In re Bryson Properties, XVIII, 961 F.2d 496, 500 (4th Cir. 1992) ("If a class rejects the plan, the court may nevertheless confirm over the objection of impaired classes so long as the plan does not discriminate unfairly,... is fair and equitable with respect to each impaired class of claims, and the other requirements of confirmation are met.") The fair and equitable requirement is satisfied if the claimholder retains its lien and receives "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of the claimholder's interest in the estate's interest in such property." § 1129(b)(1)(A)(i)(I) – (II).

---

[7]     First Citizens also argued in its Objection that the previous plan was not feasible, but did not present evidence at the hearing disputing Debtor's evidence in support of feasibility of the amended Plan. Accordingly, the Court finds that this argument has been either resolved by the filing of the amended Plan or abandoned.

[8]     First Citizens has not argued that the plan discriminates unfairly.

### a. First Citizens' Rights as Electing Creditor under 1111(b)

First Citizens asserts that the Plan is not fair and equitable because it fails to properly recognize its rights as an electing secured creditor under § 1111(b)(2). Section 1111(b) allows an undersecured lienholder to waive its deficiency claim as to the debtor and, notwithstanding § 506, elect to have the claim treated as secured to the full amount of the debt. To comply with the cramdown requirements of § 1129(b)(2)(A)(i)(I), the plan must provide that the electing creditor receives a lien equal to the total amount of its claim. The requirements for addressing the § 1111(b)(2) election in a plan of reorganization has been described by the Bankruptcy Appellant Panel for the Sixth Circuit as follows:

> Subsection (II) of 1129(b)(2)(A)(i) guarantees an electing creditor a stream of payments equal to its total claim. However, the stream of payments need only have a present value "of at least the value of such holder's interest in the estate's interest in such property," i.e., the value of the collateral.... In other words, the present value of the electing creditor's stream of payments need only equal the present value of the collateral, which is the same amount that must be received by the nonelecting creditor, but the sum of the payments must be in an amount equal to at least the creditor's total claim.

In re Brice Road Developments, LLC, 392 B.R. 274, 285 (6th Cir. B.A.P. 2008) (quoting First Fed. Bank of Cal. V. Weinstein (In re Weinstein), 227 B.R. 284, 294 (9th Cir. B.A.P. 1998)).

As a result of its election under § 1111(b), First Citizens has allowed secured claims in the amount of $1,202,119.44 for Note A, secured by the American Drive Property, and $1,633,399.49 for Note B, secured by the Woody Jones Property. The Plan provides that First Citizens shall retain its lien on the American Drive Property and the Woody Jones Property to the extent of the allowed amount of its respective claims on

each property.  With respect to Note A, Debtor's Plan proposes to make payments of principal and interest in consecutive monthly installments of $5,179.95 in months 1 through 60, and then $5,679.95 in months 61 through 120, calculated based upon an amortization of three hundred months from and after the effective date.  With respect to Note B, Debtor's Plan proposes to make payments of principal and interest in consecutive monthly installments of $5,580.53 in months 1 through 60, and $6,080.53 in months 61 through 120, calculated based upon an amortization of three hundred months from and after the effective date.  For both Note A and Note B, the Plan also provides for a balloon payment of any unpaid accrued interest and principal at the end of the 10-year term (in the 120th month). For both Note A and Note B, the Plan further provides that, "[i]n the event of prepayment, a sale of the property, or a payoff in the 120th month, whichever occurs first, First Citizens will receive a premium payment [(the "§ 1111(b) Premium")] calculated by deducting from First Citizens' total claim the total of all payments (principal and interest, including adequate protection payments) to ensure full payment of [its] total claim." The Plan does not contemplate the execution of new notes by Debtor.

Based on the evidence presented by Debtor, it appears that the deferred cash payments that First Citizens receives under the Plan will total at least the amount of First Citizens' allowed claims.  The loan is amortized based on an expected loan amount equal to the value of First Citizens' interest in the properties as of confirmation, i.e., $924,941.30[9] for Note A (American Drive Property) and $990,172.49[10] for Note B

---

[9]     This amount was calculated by subtracting a senior tax lien in the amount of $21,204.21 and adequate protection payments totaling $10,854.48 from the appraised value of American Drive Property of $957,000.00.

[10]     This amount was calculated by subtracting a senior tax lien in the amount of $21,406.11 and adequate protection payments totaling $10,421.40 from the appraised value Woody Jones Property of $1,022,000.00.

(Woody Jones Property). With the inclusion of interest at the rate of 5.5% per annum, the amortization schedule presented into evidence by Debtor indicates that the total payments over the term of the loan would equal $1,388,652.19 for Note A and $1,619,787.81 for Note B. To the extent that the total amount of payments made over the course of the loan plus the adequate protection payments does not equal the amounts of First Citizens' secured claims at the end of its term or in the event of prepayment, the Plan provides for a § 1111(b) premium payment to ensure payment in full to First Citizens.

First Citizens argues that the interest payments should not be allowed to serve a dual purpose of maintaining the present value of its interest in the collateral and satisfying Debtor's obligation to pay First Citizens the full, allowed amount of its claims. It further argues that Debtor must provide new notes in the face amount of its total claims, so that it is ensured of receiving the allowed amount of the total claim even if the obligation under the Plan is paid prior to maturity. As support for these arguments, First Citizens cites In re 222 Liberty Assocs., 108 B.R. 971, 994 (Bankr. E.D. Pa. 1990), where the bankruptcy court held that a plan providing for a note in the principal amount of secured claim rather than the allowed amount of its claim denied the creditor an effective election under § 1111(b), and In re 266 Washington Assocs., 141 B.R. 275, 284 n.17 (Bankr. E.D.N.Y. 1992), where the bankruptcy court stated that if a § 1111(b) election is made, "the plan must provide for the electing class to receive, on account of the secured claim, payments, either present or deferred, of a principal face amount equal to the entire claim and of a present value equal to the value of the collateral." First Citizens argues that its position is also supported the legislative history of § 1111(b), which provides that

"the plan must provide for the holder to receive, on account of the allowed secured claims, payments, either present or deferred, of a principal face amount equal to the amount of the debt and of a present value equal to the value of the collateral." H.R. Report 95-595 at 6475 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6475.

Taking the opposing view, Debtor argues that the portion of payments representing interest should be credited towards the payment of the total amount of the allowed claim. Debtor cites the more recent cases of <u>In re Brice Road Development, LLC</u>, 392 B.R. 274, 287 – 88 (B.A.P. 6th Cir. 2008) and <u>In the Matter of IPC Altanta Ltd. P'ship</u>, 163 B.R. 396,  399-400 (Bankr. N.D. Ga. 1994), which indicate that interest payments, in addition to payments on principal, can be used to satisfy both the requirement that the stream of payments must at least equal the total allowed claim and the requirement that the payments must have a present value equal to the value of the collateral. Debtor's position appears to be the majority rule. <u>See</u> Stephen R. Haydon, *The 1111(b)(2) Election: A Primer*, 13 Bankr. Dev. J. 99, 126 (1996) ("The view that interest payments can be applied to principal is the majority rule, reflecting the commonly accepted approach to the 1111(b)(2) Election Option."); <u>see also</u> <u>In re Bloomingdale Partners</u>, 155 B.R. 961, 974 (Bankr. N.D.Ill. 1993) (stating "the same payments under the plan must satisfy two requirements: (1) the simple, arithmetic total of the stream of payments must at least equal the total claim, and (2) those payments must have a present value equal to the value of the collateral."); <u>In re Southern Missouri Towing Serv., Inc.</u>, 35 B.R.313 (Bankr. W.D.Mo. 1983) (indicating that a plan treatment where principal and interest payments totaled only the amount of the claim would not be objectionable); 3 DAVID G. EPSTEIN, ET AL., BANKRUPTCY§ 10-27, at 52-53

(1992) (stating "[t]he implication from section 1129 is that the interest payments really do double duty and those payments have not only satisfied the present value requirement, but also should be used to reduce the principal amount of the mortgage").

The Court believes that the majority view is the better reasoned approach and concludes that interest payments may serve a dual purpose of satisfying the total allowed claim of the creditor and providing present value to the creditor.

First Citizens further argues that the Debtor should be required to provide a note in the full amount of the claim as protection for its lien in the event that the collateral subsequently increases in value and is sold after confirmation.  If Debtor is allowed to make payments on a note in the face amount of the value of the collateral and the value of the property increases post confirmation, First Citizens argues that a sale of the collateral would allow satisfaction of First Citizens' lien in the lesser amount of the note, which would provide a windfall to Debtor.  Since § 1111(b) was designed to give an advantage to the electing creditor by providing it with a lien securing the full amount of the allowed claim, it would go against Congressional intent to allow Debtor to satisfy the lien in the lesser amount of the note.  However, as stated by the Bankruptcy Appellate Panel for the Sixth Circuit in In re Brice Road Developments, there are two ways a debtor can ensure that a creditor will receive payments totaling its allowed claim and that its lien will remain in place until full payment has been received: (1) the debtor may specifically provide in the note for payment of an § 1111(b) premium in the event of a sale or prepayment, which is calculated as the difference between the total allowed claim and the outstanding principal balance remaining due on the note plus the payments made to date, or (2) the debtor may provide for a note in the face amount of the electing creditor's

allowed claim but with a below market interest rate such that the present value of the note would still only be the present value of the collateral.[11]  392 B.R. at 287.

In light of the Plan's provision of a § 1111(b) premium and the retention of First Citizen's lien, the Court will not require Debtor to execute a note in the face amount of First Citizens' allowed claim in order to satisfy the requirements for confirmation.

### b.  *Present Value*

First Citizens further argues that even if interest payments are properly included in the sum of payments totaling the full amount of its allowed claims, Debtor's Plan still violates § 1129(b)(2)(A)(i)(II) because it fails to provide payments of a present value, as of the effective date, of at least the value of First Citizens' interest in the collateral. Since First Citizens exercised the § 1111(b) election, to ensure that First Citizens is fully secured under the Plan, Debtor must satisfy both the requirement that First Citizens receive payments over the life of the plan aggregating the full amount of its entire claim, as discussed above, and the requirement that the total deferred payments proposed under the Plan have a "present value" at least equal to the value of First Citizens' interest in the estate's interest in the property subject to First Citizens' lien, i.e., the value of the collateral. See § 1129(b)(2)(A)(i)(II). "'Present value' includes the 'time value of money,' and 'compensates the creditor for not receiving its money today by charging an additional sum based on a rate of interest called the 'discount rate.'" In re Bryson Props., XVIII, 961 F.2d 496, 500 n.4 (4th Cir. 1992).   "By requiring that interest at an

---

[11] The Bankruptcy Appellate Panel further observed in a footnote that "In those instances in which the plan proponent contemplates issuance of a note to the secured creditor who elected § 1111(b) treatment, in an amount equivalent to the creditor's claim, § 1129 may not mandate that the interest rate be based on a market rate or the formulaic rate espoused by Till. Because application of § 1111(b) requires that the present value of such a note equal only the value of the creditor's collateral, the solution lies in a below-market rate of interest." 392 B.R. at 287 n.8.

appropriate discount rate be paid on the unpaid portion of the secured claim, the creditor

receives the present value of its claim." In re Weinstein, 227 B.R. 284, 294 n. 11 (9th Cir.

B.A.P. 1998).

The parties disagree on the appropriate interest rate to apply to provide First

Citizens with present value at least equal to the value of its collateral. In a footnote in the

Chapter 13 case of Till v. SCS Credit Corp., the United States Supreme Court suggested

that a formula approach should be used to determine the proper interest rate for a loan

repayment provided pursuant to a Chapter 11 plan to provide a creditor with present

value in cases where no efficient market exists for such a loan. 541 U.S. 465, 477 n.14

(2004).  The formula approach uses a national prime rate, which is adjusted for the risk of

non-payment. Id. at 479.  The burden of establishing the proper risk adjustment is borne

by the creditor. Till, 541 U.S. at 479.   In Bank of Montreal v. Official Comm. of

Unsecured Creditors (In re Am. HomePatient, Inc.), 420 F.3d 559, 568 (6th Cir. 2005),

the Sixth Circuit examined the application of Till in a Chapter 11 case and established a

two-step process: "[T]he market rate should be applied in Chapter 11 cases where there

exists an efficient market.  But where no efficient market exists for a Chapter 11 debtor,

then the bankruptcy court should employ the formula approach endorsed by the *Till*

plurality." This two-step process for determining the appropriate interest rate in Chapter

11 cases has been adopted by a majority of the courts. See e.g., In re Brice Rd. Devs.,

LLC, 392 B.R. at 280; In re VDG Chicken, LLC, No. NV-10-1278, 2011 Bankr. LEXIS

1795 (B.A.P. 9th Cir. Feb. 18, 2011); In re Timberline Enters., 348 B.R. 412, 432 (Bankr.

N.D. Tex. 2006); In re Wentworth Hills, LLC, No. 11-11448, 2011 Bankr. LEXIS 4945

(Bankr. E.D. Mass. Dec. 16, 2011); In re Mace, No. 08-06124, 2011 Bankr. LEXIS 280

(Bankr. M.D.Tenn. Jan. 25, 2011).

### 1.   *Efficient Market Analysis*

Neither party appears to argue that an efficient market exists for a loan similar in

nature to the one provided under the Plan.  There was no testimony showing that Debtor

had been offered or could obtain financing from another lender under similar terms. In

fact, the testimony of both of First Citizens' witnesses, each of whom have experience

and knowledge regarding real estate financing, indicated that such financing would be

unavailable to Debtor because the loan proposed under the Plan has a loan to value ratio

of 100% and Debtor's creditworthiness is less than favorable due to its prior default on

the First Citizens loans and its bankruptcy filing. Since the evidence presented indicates

that there is not an efficient market for this loan, the formula approach should be applied

in this case.  See Am. HomePatient, 420 F.3d at 568 (finding that the Till formula rate is

appropriate when there is no efficient market).  Using the Till approach, the national

prime rate should be adjusted to compensate for the circumstances of the bankruptcy

estate, the nature of the security, and the duration and feasibility of the Plan.  Till, 541

U.S. at 479.

### 2.   *Application of Formula Approach*

As to both Notes, Debtor proposes an interest rate of 5.50% per annum in the

Plan.  To support its calculation of the proper interest rate to provide First Citizens with a

present value at least equal to the value of its collateral, Debtor presented the testimony

of Catherine Holt, who was qualified as an expert on this issue. Ms. Holt testified that

that she calculated the interest rate using the formula approach.  Ms. Holt testified that

16

she added a risk premium of 2.25% to the the prime rate published in the Wall Street Journal of 3.25% to arrive at a Plan rate of 5.50%.  When calculating the risk premium, she testified that she considered the circumstances of the estate, the nature of the security, the duration and feasibility of the plan. Specifically, she noted that the bankruptcy estate has made significant improvements since the petition was filed on July 12, 2011, including the addition of a new tenant, La Bamba, and the conversion of a non-performing location of Jack's Place into a steady monthly rental income with the lease to 1720 Burger Bar.  As a result of the tenant additions, she testified that Debtor's annual income for the Woody Jones Property has increased by $84,264.  She further testified that Debtor has been able to increase the profitability of its other Jack's Place restaurant locations by cutting costs and changing the menu, resulting in a positive cash flow to Debtor.  As to the nature of the security, Ms. Holt relied on the opinion of First Citizens' appraiser, Andrew Fowler, who stated that the businesses were in a growth neighborhood, were relatively new construction, were in a good location (as to Woody Jones Property only), and had below average risk.  Ms. Holt also testified that the budget projections she prepared, which were admitted into evidence, show that Debtor will have the funds available to make the payments proposed under the Plan.   Based on the presence of these positive factors, she argued that the risk premium of 2.25% was appropriate. Ms. Holt's testimony indicated that the payments of principal and interest at the rate of 5.50% under the Plan would provide First Citizens with present value at least equal to the current appraised value of their collateral (less the senior tax liens on the properties).

17

First Citizens presented the testimony of its appraiser, Andrew Fowler, and Terry

Kirven, Special Assets Officer of First Citizens Bank, regarding the appropriate cram

down interest rate for First Citizens' loan. Mr. Fowler, who was qualified as an expert

regarding present value, testified that he believed the proper interest rate for a loan of this

nature would be "somewhere in the neighborhood of 6.25 to 6.75%."[12] Because the

properties are in a growth neighborhood and the improvements are only three years old,

he testified that he believed that the risks associated with the properties were below

average.  To calculate his proposed interest rate range of 6.25 to 6.75%, he relied on a

Permanent Financing chart prepared by RealtyRates.com, which provided a minimum

rate of 3.10%, a maximum rate of 8.59%, and an average rate of 5.18%, for a loan

secured by retail commercial property. An additional adjustment was made because the

chart contemplated a maximum loan to value ratio of 80%.  Mr. Fowler further stated his

opinion that the 5.50% interest rate applied by Ms. Holt did not allow for sufficient profit

to provide an investor with the motivation to lend.  Mr. Kirven testified that a loan having

70% loan to value similar in the nature to the loans proposed by Debtor through the Plan

would have an interest rate in the neighborhood of 6.50 to 6.75%, and additional

adjustment for risk would be required for a loan having 100% loan to value.  He testified,

however, that there is not a market for this loan at 100% loan to value.

Considering all the factors cited in this case, the Court finds Ms. Holt's

calculation of the proper interest rate at 5.50% more persuasive since it was determined

---

[12]      Mr. Fowler testified that he calculated the present value of the stream of payments for Note A at
$692,601.00 using a 10% discount rate, and he calculated the present value of the stream of payments for
Note B at $793,686.00 using a 10% discount rate, relying on the Investment Rates table for 4th Quarter
2011 prepared by RealtyRates.com. The Court believes the approach used by Mr. Fowler in calculating
present value is more appropriate for valuation of a business, rather than a stream of payments proposed
under a Chapter 11 plan, and finds that the two-step Till approach should be used instead for calculating the
proper interest rate for a Chapter 11 plan.

using the formula approach prescribed in <u>Till</u>. While it appears that neither of First

Citizens' witnesses applied the formula approach to calculate their respective proposed

interest rates, if the Court were to assume that Mr. Fowler's 6.25 – 6.75% interest rate

range was calculated using the prime rate plus an adjustment for risk, his calculation

would incorporate a risk adjustment of 3.00 to 3.50% over prime.  Mr. Kirven's interest

rate range, if adjusted for additional risk (as he stated would be required because the loan

is a 100% loan to value loan), would exceed 3.50% over prime. Considering that the

general consensus among courts is that a one to three percent adjustment to the prime rate

is appropriate,[13] with a 1.00% adjustment representing the low risk debtor and a 3.00%

adjustment representing a high risk debtor, a risk adjustment of more than 3.00% would

appear to be inappropriate under circumstances that Mr. Fowler testified show "below

average risk." <u>See</u>  <u>In re Riverbend Leasing LLC</u>, 458 B.R. 520 (Bankr. S.D. Iowa 2011)

(applying 2.50% over prime for a total of 5.75%, for loan secured by a condominium

development); <u>In re Greenwood Point</u>, LP 445 B.R. 885, 918-19 (Bankr. S.D. Ind. 2011)

(applying 3.0% over prime for a total of 6.25%, for a loan secured by a retail shopping

center containing approximately 136,000 square feet of gross leasable space); <u>SPCP</u>

<u>Group, LLC v. Cypress Creek Assisted Living Residence, Inc.</u>, 434 B.R. 650 (M.D. Fla.

2010) (applying 2.0% risk adjustment over prime for a total of 5.25% for a loan secured

by an assisted living facility valued at $5.4 million); <u>In re Industry West Commerce Ctr.,</u>

<u>LLC</u>, BAP No. NC-10-1336-JuHBa, 2011 Bankr. LEXIS 2090 (B.A.P. 9th Cir. May 24,

2011) (applying 1.70% risk adjustment over prime for a total of 4.95%, for loan secured

by commercial real property); <u>In re VDG Chicken, LLC</u>, BAP No. NV-10-1278-HKidD,

2011 Bankr. LEXIS 1795 (B.A.P. 9th Cir. Apr. 11, 2011) (applying risk adjustment of

---

[13] <u>See</u> <u>Till</u>, 541 U.S. at 480.

100-200 basis points over the 10-year treasury rate for a total of 6.0%, for a loan secured by commercial property in Las Vegas, Nevada); In re Wentworth Hills, LLC, No. 11-11448-FJB, 2011 Bankr. LEXIS 4945 (Bankr. D. Mass. Dec. 16, 2011) (applying 1.75% over the prime rate for a total of 5.0%, for a loan secured by a golf course); In re SW Boston Hotel Venture, LLC, No. 10-14535-JNF, 2011 Bankr. LEXIS 4384 (Bankr. D. Mass Nov. 14, 2011) (applying 1.0% over the prime rate for a total of 4.25%, for a loan secured by a hotel); In re Mace, 2011 Bankr. LEXIS 280 (Bankr. M.D. Tenn. Jan. 25, 2011) (applying 2.50% over prime for a total of 6.0%, for a loan secured by rental real properties).  Based on the evidence presented, the Court finds that First Citizens failed to demonstrate that a risk adjustment outside of the generally accepted range of one to three percent is warranted.  Considering the circumstances of this case, the Court finds that Ms. Holt's risk adjustment of 2.25% above prime is appropriate.  Accordingly, the Court finds that the 5.50% interest rate proposed under the Plan is adequate to provide payments of a present value, as of the effective date, of at least the value of First Citizens' interest in the collateral.

## CONCLUSION

Based on the foregoing, the Court finds that First Citizens is treated fairly and equitably by Debtor's Plan. Accordingly, First Citizens' objection to confirmation is overruled.  The Court further finds that the Plan meets all applicable requirements of § 1129(a) and (b) and should be confirmed.  The Court will enter a separate order confirming the Plan.

**AND IT IS SO ORDERED.**